[L.A. No. 30811. Mar. 3, 1978.]

PHILIP J. CAITO et al., Plaintiffs and Respondents, v.
UNITED CALIFORNIA BANK, Defendant and Appellant.

COUNSEL

Lillick, McHose & Charles, John F. Kimberling, Nancy R. Schauer, John M. Mann and Marc S. Homme for Defendant and Appellant.

Horton, Knox, Carter & Foote, R. L. Knox, Jr., and Frank A. Oswalt III for Plaintiffs and Respondents.

OPINION

CLARK, J.—United California Bank appeals from judgment declaring the interests of Philip and Theodora Caito in proceeds of a nonjudicial foreclosure of real property to be senior to those of the bank.

From 1952 to 1973, Mr. and Mrs. Caito and A. P. and Marie Caponi were cotenants in a 130-acre farm near Calexico. The Caitos resided in Indiana and the Caponis managed the property until Mr. Caponi was disabled in 1967.

In 1959, to enable the Caponis to borrow $30,000, both Caitos and Caponis executed a $30,000 note in favor of Bank of America, secured by a deed of trust on the farm. The Caitos, who received no part of the loan proceeds, purported to sign the note and deed of trust only as an accommodation to the Caponis, not intending to encumber their interest in the farm. However, the Caitos appear as principals on both the note and recorded deed of trust.

In 1965—to enable the Caponis to again borrow money—the Caitos and Caponis executed a $40,000 note secured by new deed of trust in favor of Bank of America. The Caponis used a portion of the loan proceeds to pay the balance then owing on the $30,000 note, retaining the remainder of the proceeds. Again, the Caitos signed intending only to accommodate the Caponis, but the documents again fail to limit them to an accommodation status. In 1967 the Caitos loaned $6,000 to the

Caponis, enabling them to keep the Bank of America loan in a current status.[1]

During the period of their indebtedness to Bank of America, the Caponis also were indebted to United California Bank (UCB), approximating $140,000 in February 1967. The UCB loan was then secured by deeds of trust on Caponi property other than the Calexico farm. In December 1967 UCB made demand on the Caponis for payment. The Caponis, unable to satisfy the demand, agreed to further secure the notes by a second deed of trust on their interest in the Calexico farm in exchange for UCB's promise to forebear taking immediate legal action. Signed only by the Caponis, this deed of trust was both executed and recorded without the knowledge or consent of the Caitos.

After Mr. Caponi became disabled, the Caitos assumed management of the Calexico farm in July 1968. Collecting $17,500 in rentals, the Caitos paid that sum to Bank of America to be applied on the $40,000 note pursuant to an assignment of rents, issues and profits.

In 1971 Bank of America refused to waive its right to accelerated payment of the Caponis' then delinquent note. In the same year the Caitos commenced the instant action seeking partition, accounting, and declaration of rights and priorities of all parties claiming an interest in the Calexico farm. Named as defendants were the Caponis, Bank of America as beneficiary and a corporate trustee of the first deed of trust, and UCB as beneficiary and trustee of the second deed of trust. While the action was pending, Bank of America caused the farm to be sold for $130,000 pursuant to nonjudicial foreclosure of the first deed of trust. Retaining $44,552.34 pursuant to its note and deed of trust, Bank of America deposited the remaining $85,447.66 in court and it and its trustee were dismissed as defendants. No challenge is made to either the propriety of the foreclosure or the amount of the funds deposited by the bank.

The trial court found the Caitos acted only as accommodation makers on the Bank of America note, concluding that because the $44,552.34 indebtedness to the bank was satisfied out of the Caponis' $65,000 (one-half interest in the $130,000 sale proceeds), the Caitos' one-half interest was not to be charged with any part of the amount due Bank of America. The Caitos were thus declared entitled to $65,000 from the

---

[1] It appears that only $3,232.94 of the $6,000 was actually applied to the Bank of America note.

$85,447.66 surplus following foreclosure sale. The trial court further concluded the Caitos were entitled to prior reimbursement of $6,000, the sum advanced to the Caponis in 1967, and $17,500 representing rental collections paid over to Bank of America in 1968.[2] Because the priority claims of the Caitos were found to exceed the balance of the surplus fund, UCB was awarded no part of it.

While the judgment properly resolves issues between the Caitos and Caponis, UCB claims the court failed to take into consideration the bank's security position as a bona fide encumbrancer for value. UCB contends it acquired a security interest in the property without notice of the Caitos' accommodation status or of reimbursement claims asserted by the Caitos against the Caponis. Insofar as UCB is concerned, both the Caitos' and Caponis' interests in the Calexico farm must be equally subject to satisfying the security for the Bank of America note. The indebtedness should therefore be deducted from the net sale proceeds and the surplus ($85,447.66) allocated equally between the cotenants, subject to whatever further claims may be individually asserted against a cotenant. The Caponis' share of the surplus ($42,723.83) would thus be subject to UCB's claim pursuant to the note secured by the second deed of trust.

UCB further argues that because it had no notice of moneys advanced by the Caitos to or on behalf of the Caponis, its secured position in the Caponis' share of the surplus cannot be subordinated to the Caitos' claims.

SCOPE OF LIEN OF BANK OF AMERICA NOTE AND DEED OF TRUST

An accommodation party is one who signs an instrument in any capacity for the purpose of lending his name for the benefit of another. (Cal. U. Com. Code, § 3415, subd. (1); see generally, 2 Anderson, Uniform Commercial Code (2d ed. 1971) § 3-415.) An accommodation party is a surety and the accommodated party a principal; if the accommodation party is forced to pay the instrument, he has a right of

---

[2]The trial court apparently concluded the Caitos were entitled under the doctrine of equitable subrogation to priority for the $6,000 advance because the obligation to Bank of America had been reduced by this amount *prior* to the lien of UCB's second deed of trust in 1967. Also under the doctrine of equitable subrogation the court concluded Bank of America's obligation had been further reduced by $17,500 through assignment of rentals *after* the date of UCB's lien, thus entitling the Caitos to priority for their equitable claim in that amount.

recourse against the accommodated party. (Cal. U. Com. Code, § 3415, subd. (5).)

 If, as in the instant case, one who is in fact an accommodation party nevertheless signs as maker of the note and security instruments, he is bound on the instruments to the same extent as his comaker. "One who appears to be a principal, whether by the terms of a written instrument or otherwise, may show that he is in fact a surety, *except* as against persons who have acted on the faith of his apparent character of principal." (Civ. Code, § 2832; italics added; see also *Beverly Hills Nat. Bank* v. *Glynn* (1968) 267 Cal.App.2d 859, 868-869 [73 Cal.Rptr. 808].)

 It is undisputed Bank of America was a bona fide encumbrancer for value in its acquisition of the beneficial right evidenced by the first deed of trust. The Caitos, as well as the Caponis, were liable as principal obligors and the entire value of the farm was thus subject to the satisfaction of the note. If, for instance, the foreclosure sale had yielded only enough to satisfy the bank's obligation, then the full interests of both the Caponis and Caitos would have been forfeited. Because the Bank of America note was thus satisfied equally out of the Caponis' and the Caitos' individual interests, the surplus remaining ($85,447.66) represented the combined interests equally allocable to the Caponis and Caitos, or to lien claims against their respective shares.

### PRIORITY OF LIENS AGAINST SURPLUS FUND ALLOCABLE TO CAPONIS

Following a foreclosure sale and satisfaction of the obligation of the creditor who forecloses, subordinate liens against the foreclosed property attach to the surplus proceeds in order of their priority. (*Nomellini Constr. Co.* v. *Modesto S. & L. Assn.* (1969) 275 Cal.App.2d 114, 118 [79 Cal.Rptr. 717].) When a cotenant has separately encumbered his interest in the property and, as here, such encumbrance is one of the subordinate liens, it attaches only to such cotenant's interest. (See *Schoenfeld* v. *Norberg* (1970) 11 Cal.App.3d 755, 765 [90 Cal.Rptr. 47]; *Haster* v. *Blair* (1940) 41 Cal.App.2d 896, 898 [107 P.2d 933].) Thus, the UCB lien, represented by its second deed of trust, attached to only the Caponis' one-half interest in the surplus fund. The more difficult question is whether the Caitos' *inter se* claims against the Caponis can be asserted against the Caponis' share of the surplus fund as an equitable lien with priority over UCB's lien. The trial court so held.

A recorded instrument, as in this case the Bank of America deed of trust, is constructive notice only of its own contents and of other documents referred to by it. (Civ. Code, § 1312; *Davis* v. *Ward* (1895) 109 Cal. 186, 189 [41 P. 1010]; *Duncan* v. *Ledig* (1949) 90 Cal.App.2d 7, 12 [202 P.2d 107]; *Hamilton* v. *Consolidated Water Co.* (1921) 56 Cal.App. 7, 11 [204 P. 416].) ▮ Joint ownership is not in itself a circumstance sufficient to impose a duty on an encumbrancer to inquire whether there are unrecorded agreements between joint owners. (*Kirby Lumber Co.* v. *Temple Lumber Co.* (1935) 125 Tex. 294 [83 S.W.2d 638, 643].) Policy runs against upholding secret liens and charges to the injury of subsequent innocent encumbrancers. (*Schut* v. *Doyle* (1959) 168 Cal.App.2d 698, 702 [336 P.2d 567].) Inquiry does not become a duty when apparent possession is consistent with title appearing of record. (*Smith* v. *Yule* (1866) 31 Cal. 180, 184; *Three Sixty Five Club* v. *Shostak* (1951) 104 Cal.App.2d 735, 738 [232 P.2d 546]; *Pacific Fruit Exchange* v. *Schropfer* (1929) 99 Cal.App. 692, 694 [279 P. 170].)

▮ At the time it bargained for the security of the second deed of trust, UCB had neither actual nor constructive notice that the Caitos had signed the Bank of America note and first deed of trust as an accommodation only. While it is manifest that as between the accommodation and accommodated parties equitable liens have been established "the question is whether the lien binds subsequent purchasers and encumbrancers for value whose rights accrue before adjudication of the lien. A purchaser (including an encumbrancer) in good faith for value and without actual or constructive notice is entitled to protection against undisclosed liens and equities existing against . . . unrecorded instruments." (2 Ogden, Cal. Real Property Law (Cont.Ed.Bar 1975) pp. 973-974.) UCB thus had a right to rely on the record which indicated the Bank of America note would be satisfied equally out of the respective shares of the cotenants. On that record UCB entered into its financing arrangements with the Caponis, giving value for the security position it bargained for.[3] It is accordingly entitled to the benefits of a bona fide encumbrancer for value without notice of any prior claim other than that asserted by Bank of America.

---

[3]The trial court found and concluded: ". . . UCB and the CAPONIS entered into an oral agreement whereby UCB agreed to forebear taking immediate legal action to collect [the Caponi notes], to withdraw its demand for immediate payment of [the Caponi notes], and to accept the UCB Deed of Trust as additional security for the payment of [the Caponi notes]. The foregoing oral agreement was fully performed by UCB and the CAPONIS, and the UCB Deed of Trust is supported by the full, fair and adequate consideration of the parties thereto. Ever since the date of its execution, the UCB Deed of Trust has been and now is the binding obligation of the CAPONIS, enforceable in accordance with its terms."

It is apparent from the foregoing the Caitos are foreclosed from asserting against the Caponis' share of the surplus fund, a priority claim for contribution made from the Caito interest in satisfying the demand of Bank of America. However, this does not necessarily foreclose the Caito claim based on moneys advanced by them to or on behalf of the Caponis for purposes of reducing the Bank of America note which, in turn, improved the security position of UCB. The Caitos claim that to the extent of such payments they are entitled to be subrogated to the position of Bank of America. After impression of UCB's lien, the Bank of America note was reduced by a $17,500 payment for which the Caitos claim credit. Without such payment, Bank of America would have been entitled to an additional $17,500, plus interest, from the proceeds of the foreclosure sale. The Caitos claim that if they are accorded a senior lien on a theory of equitable subrogation no injustice would be worked on UCB.

In *Shaffer* v. *McCloskey* (1894) 101 Cal. 576 [36 P. 196], cotenant purchasers of a parcel of real property each executed a purchase money mortgage. One of the cotenants, without knowledge of the other, executed and recorded a deed of trust on his half interest in the land, and then conveyed his remaining interest to the other cotenant who thereafter satisfied the purchase money mortgage. We held he was entitled to be subrogated to the rights of the mortgagee as against the holder of the deed of trust, thus according to him a priority position. We reasoned the beneficiary of the deed of trust took his interest with full knowledge of the mortgage, and the cotenant, in retiring the mortgage, intended his payment would inure to his benefit and not to the benefit of an unknown security interest. We concluded there was no equitable ground upon which the beneficiary of the deed of trust was misled or could complain, as he was left in the exact position he would have expected to occupy when the trust deed was taken.

The instant case cannot be substantively distinguished from *Shaffer*. In each case cotenants of land were equally obligated on a debt secured by the whole of their land. One cotenant became obligated to a second creditor, creating a junior lien on only that cotenant's share of the land. The other cotenant, unaware of the second security transaction, retired all or a part of the obligation owed the first creditor, thereby eliminating or reducing the claim of lien senior to that of the second creditor. Should

such junior lien holder benefit by the cotenant's payment, or should the cotenant be subrogated to the right and step into the shoes of the senior creditor and thus be accorded a priority security position? *Shaffer* holds that because the junior creditor did not bargain for any improvement in its secured position, and because the cotenant intended to benefit only himself in paying the mortgage, equitable principles required that he be subrogated to the rights of the mortgagee.

■ One who claims to be equitably subrogated to the rights of a secured creditor must satisfy certain prerequisites. These are: "(1) Payment must have been made by the subrogee to protect his own interest. (2) The subrogee must not have acted as a volunteer. (3) The debt paid must be one for which the subrogee was not primarily liable. (4) The entire debt must have been paid. (5) Subrogation must not work any injustice to the rights of others." (*Grant* v. *de Otte* (1954) 122 Cal.App.2d 724, 728 [265 P.2d 952]; see also *Employers etc. Ins. Co.* v. *Pac. Indem. Co.* (1959) 167 Cal.App.2d 369, 376 [334 P.2d 658]; 11 Hastings L.J. 474.) ■ "As now applied [the doctrine of equitable subrogation] is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter." (*Estate of Kemmerrer* (1952) 114 Cal.App.2d 810, 814 [251 P.2d 345, 35 A.L.R.2d 1393]; 7 Witkin, Summary of Cal. Law (8th ed. 1974) § 124, pp. 5342-5343.)

It is obvious of course that a debtor-landowner, having granted to creditors successive security interests in his lands, cannot be subrogated to the priority position of the senior creditor when the debtor satisfied the obligation owed that creditor. The debtor has not, in such a case, satisfied the third prerequisite that the debt paid be one for which he was not primarily liable.

■ When, as in the instant and the *Shaffer* cases, there are codebtors who, as far as the record shows, are equally obligated cotenants of land pledged as security, the problem is more complex. There is initially the problem of who is primarily liable for the debt owed the senior creditor. If the record shows, for instance, that each cotenant is personally obligated for but half of the debt, and if one cotenant is required to pay the full debt in order to protect his position, then it appears he should be subrogated to the senior creditor's security position but only to the extent of the half payment made on behalf of the defaulting cotenant, assuming all other prerequisites for equitable subrogation are satisfied. He cannot

be subrogated to the full amount of his payment as half thereof was made on his own account as the primary obligor, and the doctrine is inapplicable in that circumstance.[4]

■ The instant case differs from the foregoing hypothetical case in that the record does not show each cotenant debtor to be personally obligated for but half the debt. The record shows instead that each is primarily obligated for the full debt. Strict application of the rule discussed above would thus require concluding that when the Caitos made payments to the Bank of America after impression of the UCB lien and before the foreclosure sale, they did so as persons primarily obligated and thus are not entitled to be subrogated. The Caitos assert, however, that because the doctrine they rely on is grounded on the equitable principles discussed in *Shaffer*, strict application of the rule is not warranted.

Equitable considerations similar to those in *Shaffer* favor the Caitos. Even the fact the Caitos were primarily obligated to the Bank of America for the full amount of the debt might be offset on equitable grounds. Thus the record showed the Caitos and the Caponis to be tenants in common as to the land. ■ When two or more persons take as tenants in common under an instrument silent as to their respective shares, a presumption arises their shares are equal. (*Anderson* v. *Broadwell* (1931) 119 Cal.App. 150 [6 P.2d 267]; Annot., 156 A.L.R. 515, 516-517.) ■ UCB accordingly had notice the Caitos and the Caponis were presumably equal owners and, as between themselves, presumably equally obligated on the debt to the Bank of America. It seems clear that although the Caitos could not be subrogated as to their share of the obligation paid to the Bank of America (*Grant* v. *de Otte, supra,* 122 Cal.App.2d 724, 728),[5] UCB could not expect to benefit by an improved security position resulting from the Caponis' debt paid by the Caitos. (*Shaffer* v. *McCloskey, supra,* 101 Cal. 576.) The Caitos would then have paid a debt " 'for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter.' " (*Estate of Kemmerer, supra,* 114 Cal.App.2d 810, 814.)

---

[4]We do not deem our conclusion herein necessarily contrary to *Shaffer. Shaffer* holds that the codebtor who satisfied the obligation was entitled to be subrogated, but it does not address the issue of the dollar amount of the priority which was or should have been accorded him.

[5]Because any payment would reduce the first lien of the Bank of America against the proceeds of the foreclosure sale, the surplus fund would be correspondingly increased,

If, as the Caitos claim, they are to be equitably subrogated to the extent of payments made by them to the Bank of America before foreclosure, an examination of such payments is necessary. We examine first the $17,500 found by the court to have been paid by the Caitos. The court found the whole of such payments to have been made by the Caitos, although it is clear that the source of the money was rentals from the Calexico farm collected by the Caitos who then managed it on behalf of themselves and the Caponis. We are unaware of the trial court's reasons for its holding that the whole rather than half of the rentals became the property of the Caitos upon collection. Perhaps it was on a theory that because the Caponis had received the whole benefit of prior rental income in amounts exceeding the Caito collections, the Caitos were entitled to retain their collections as a partial offset.

Two reasons exist why the $17,500 payment cannot be deemed moneys first accruing to the Caitos and then paid in their behalf to the Bank of America. First, the rents, issues and profits of the Calexico farm were expressly assigned to the bank and thus could not have been collected by the Caitos as their moneys in offset of earlier collections benefiting the Caponis. The rents were thus collected by the Caitos as agents for the bank.

Next, if we were to recognize that the Caitos could satisfy their claims against the Caponis in this manner we would thereby give effect to secret or undisclosed equities existing between cotenants, contrary to established law. We have noted the policy against upholding secret liens and charges to the injury of subsequent innocent purchasers or encumbrancers—here UCB. (*Schut* v. *Doyle, supra,* 168 Cal.App.2d 698, 702.) UCB bargained for the second deed of trust without notice of any right of contribution between the Caitos and Caponis. " 'Such liens would be indefinite in amount, and undisclosed by public records, upon which third parties . . . have a right to rely. They would greatly injure tenants in common by impairing the market value of their shares and interests, because of the apprehension, on the part of those contemplating purchasing such interests or otherwise dealing with them, that claims for rents might be established as superior liens.' " (*Palpar, Inc.* v. *Thayer* (1953) 115 Cal.App.2d 333, 337 [252 P.2d 51], quoting from *Vaughn* v. *Lanford* (1908) 81 S.C. 282 [62 S.E. 316, 318].)

---

allocated one-half each to the Caitos and the Caponis or their successor. The Caitos, accordingly, would benefit by one-half of any payment.

We conclude that the $17,500 payment must be deemed to have been made to the Bank of America equally in behalf of the Caitos and the Caponis. As the Caitos cannot be subrogated to the extent of payments made in their behalf as principal obligors and cannot be credited with the Caponi share of the payment, they cannot claim a priority position as to any part of the $17,500 payment.

The court also accorded the Caitos a priority position as to $6,000 advanced by them to the Caponis prior to the impression of the UCB lien. Again, such undisclosed claim cannot be given priority over a subsequent innocent encumbrancer on an equitable subrogation doctrine. Additionally, that doctrine is inapplicable because a loan of funds to the Caponis at a time *prior* to the UCB deed of trust did not in any way alter the security position of the later UCB lien, and subrogation would thereby "work an injustice" as to it. (*Grant* v. *de Otte, supra,* 122 Cal.App.2d 724, 728.)

Because we conclude the doctrine of equitable subrogation is not applicable as to any of Caitos' claims, we need not consider UCB's further contention that the doctrine is inapplicable because the entire debt to the Bank of America was not retired by the Caito advances. (See *Grant* v. *de Otte, supra,* 724, 728; Rest., Restitution, § 162.)

The judgment is reversed.

Bird, C. J., Tobriner, J., Mosk, J., Richardson, J., Manuel, J., and Newman, J., concurred.